**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>                            )<br>           Plaintiff,       )   **CRIMINAL ACTION**<br>                            )<br>v.                          )   No.  07-10221-MLB<br>                            )<br>MICHAEL L. BIGLOW, et al.,  )<br>                            )<br>           Defendants.      )<br>_____) | |

**MEMORANDUM AND ORDER**

**I.   INTRODUCTION**

This case comes before the court on numerous motions filed by defendants pertaining to the James hearings held on January 10, 2012. (Docs. 775, 810, 843, 844, 846).[1]  Four defendants have been charged in a Fifth Superceding Indictment filed on September 14, 2011. (Doc. 776).  The indictment contains a total of 35 counts and forfeiture allegations.  In counts 1 and 2, the indictment alleges a conspiracy to distribute cocaine.  Count 1 charges Michael Biglow and count 2 charges James Black, which occurred from an unknown date until September 27, 2007, and allege a conspiracy with known and unknown coconspirators.  Defendants have also been charged with using a telephone to distribute cocaine, distribution of cocaine and gun charges.

The government intends to introduce statements which were obtained from wiretaps on cellular phones belonging to Tyrone Andrews, a previous co-defendant who has pled guilty.  Defendants have moved

---

[1] Throughout this order, the court may refer to defendants in plural even though some matters may not concern all defendants.

and/or joined in motions to exclude coconspirator statements. The government has responded. (Doc. 849). The motions are fully briefed and ripe for decision. The motions are granted in part and denied in part for the reasons herein.

**II. PROCEDURAL HISTORY**

This case was originally filed on November 20, 2007, against nine defendants. On June 6, 2008, this court granted defendant Michael Biglow's motion to suppress. (Doc. 155). The trial was set to begin on June 11, 2008. On June 9, the government appealed this court's order granting Biglow's motion. The government then moved to continue the trial against all defendants or, in the alternative, dismiss the indictment against all defendants. The government's position was that Biglow's involvement was an integral part of the conspiracy. The court granted the government's motion to dismiss the indictment.[2]

On May 12, 2009, this court received the Tenth Circuit's mandate reversing its decision. (Doc. 212). On May 13, the government filed a second superseding indictment against the original nine defendants and an additional eleven defendants. (Doc. 214). Count 1 charged a conspiracy against all defendants. On September 24 and October 21 the court conducted a James hearing to determine the admissibility of phone conversations that were recorded pursuant to a Title III wiretap. After the hearing, several defendants moved for dismissal of count 1, the conspiracy count, on the basis that the government had not established a conspiracy. (Docs. 503, 508, 511, 514, 515, 520,

---

[2] None of the defendants objected to the government's motion.

529, 535).

On October 29, the court entered an order prohibiting the telephone calls from being introduced as coconspirator statements. (Doc. 565). The court found that the government had not satisfied its burden to establish that a conspiracy existed between all defendants. The court also ruled that some of the calls, however, could be admitted for other purposes during trial. The government moved to dismiss the indictment and the court granted the government's motion.[3] (Doc. 592).

On November 10, 2009, the government filed a third superceding indictment against Tyrone Andrews and Jose Pizana charging them with conspiracy, using a telephone to distribute cocaine and distribution of cocaine. (Doc. 595). Both defendants pled guilty. On May 25, 2011, the government filed a fourth superceding indictment against James Black, Gregory Reynolds and Clerance Reed. (Doc. 745). On September 14, 2011, the government filed the fifth superceding indictment and added defendant Michael Biglow.

Defendants continue to object to the admission of the statements of their prior co-defendants on the basis that the statements are hearsay. The government asserts that defendants and their prior co-defendants are coconspirators and therefore the statements can be admitted as an exception to the hearsay rule.

**III. FACTS**[4]

---

[3] At the time of the motion to dismiss, five defendants had entered pleas of guilty.

[4] The summary in this section includes facts which were obtained from the court's first James hearing in this case, which was held on September 24, 2009. The transcript of the hearing was offered by the

-3-

Wichita Police Department ("WPD") Detective Clint Snyder first heard the name "Roni" from James Jones, a Crip who was arrested in another matter in September 2006. Jones said that Roni was a major drug supplier to gangs in the Wichita area. In October 2006, Roni's name came up again. Wichita police interviewed more people who confirmed that Roni was a major supplier of cocaine but Detective Snyder still did not know who Roni was. Some time later, a search warrant was executed at 1928 South Spruce Wichita, Kansas (the "Spruce residence") and drug paraphernalia was seized. Prentice Byrd was living in the Spruce residence at that time, but Tyrone Andrews owned it.

In May 2007, Byrd told WPD that he was receiving drugs from Andrews who also went by the name Roni. Byrd said Andrews taught him how to cook crack and was a multi-kilo dealer of cocaine. Andrews told Byrd that he sold 18 kilos in two days in early 2007, at a cost of between $16,000 to $18,000 per kilo. Detective Snyder testified that this price is consistent with prices in Wichita at that time. Byrd said that Andrews sold to numerous people, including Clarence Reed who got a kilo a week. Byrd said he also sold a kilo a week.

Byrd confirmed that Andrews owned a "stash house" near Mt. Vernon and Oliver. Detective Snyder did a property search and learned that 1821 South Ridgewood (the "stash house") was owned by Andrews. Surveillance began towards the end of May 2007. Andrews would arrive around 3:00 p.m., would stay there for awhile and then leave to meet other people at other locations. A Hispanic male driving a white

---

government during the James hearing held on January 10, 2012. (Exh. 1).

-4-

pickup would come carrying a brown bag and then leave the house after a couple of minutes. On June 4, 2007, Detective Snyder and other WPD officers did a trash pull. They found an empty sandwich box and it gave a positive indication of cocaine. Detective Snyder testified that this is a common method of packaging cocaine. Detective Snyder also learned that Jesus Valencia-Abarca was the driver of the white truck. On June 20, Detective Snyder saw the same white truck arrive.

On June 23, Byrd agreed to cooperate. He was to make a purchase of two ounces of cocaine. Byrd asked for a "two-piece" which was a code for two ounces. He was supposed to pay $1,125 but he only paid $1,000 and said he was a little short. This transaction occurred at the Spruce stash house.

On June 25, Detective Snyder observed a Nissan and the tag came back to a Jesus Lopez, who he later learned was an alias for Jose Pizana. Andrews left the stash house and went to an apartment complex. He got out of his vehicle with a bag and walked up to a building. After a few minutes, he left the building and walked out with Kevin Gunter. The bag was now blowing in the wind as if it was empty and Gunter was carrying a sack. They followed Gunter who met with Isaac Woods and Gunter passed a plastic bag to Woods. Woods was later stopped and a canine alerted and the vehicle was searched. Two kilos were recovered and they were in a plastic bag. Woods plead guilty. The Tenth Circuit affirmed this court's denial of his motion to suppress in its Order and Judgment filed October 13, 2009 in Case No. 08-3245.

On June 24, Byrd made another undercover purchase, this time requesting a "four-piece." Andrews and Byrd met in 3800 block of

-5-

South Seneca.  Byrd bought powder cocaine which Andrews sold for $2,325.  Byrd gave him $2,340 to make up for the earlier short on the "two-piece."

On July 8, there was another trash pull.  WPD officers and Detective Snyder found two empty boxes of baking soda and four empty boxes of baggies.  Detective Snyder testified that this is indicative of someone who is dealing cocaine.  WPD continued surveillance and saw a silver Nissan arrive at the stash house driven by Michael Biglow who was carrying a black attache case.  Biglow left and WPD was instructed to follow him.  There was a traffic stop and Biglow was cited him for a traffic violation.  Afterwards, Byrd told WPD that Andrews thought the police were watching his house because an officer stopped an individual who had two kilos of cocaine in his car.

In September 2007, Detective Snyder and other WPD officers set up wiretaps over the course of 17 days on the two phones owned by Andrews.  In each call, a co-defendant would call Andrews, or vice-versa.  In some of the calls, one co-defendant would ask Andrews for a specific amount of cocaine.[5]  In other calls, a co-defendant would tell Andrews that he has a specific number of points or dollars.[6]  Most of the conversations are in a form of code and are loaded with profanity and racial slurs.  See, James hearing exhibit 1.

---

[5]In several calls, one co-defendant asks Andrews for a "two-piece," "four-piece," or specific number.  Detective Snyder testified that based upon his experience, the co-defendants were asking for a specific amount of cocaine.  A 'two-piece" is two ounces of cocaine and "two" is two kilos of cocaine.

[6]For example, in Call #196, Biglow asks "how many, how many points is that?" Andrews responds "one nine."  This call reflects the agreement for Biglow to order 2 kilograms of cocaine at $19,000 per kilogram.  (Doc. 547 at 11).

In addition to the calls, the government also introduced a statement obtained by Andrews during the investigation. The statement details Andrews' activities of purchasing approximately five kilos of cocaine a week from defendants Valencia-Abarca and Pizana. James Hearing exh. 5. In that statement, Andrews does not specifically name any of the current defendants. The government also offered Andrews' plea agreement, the change of plea hearing transcript and the sentencing transcript. Andrews' plea agreement discusses his involvement in the charges. Andrews stated that the phone calls contained in the indictment[7] discuss drug transactions and that defendants purchased cocaine from him on those occasions.

The government introduced the phone calls during the hearing and stated its intention of offering all statements during the trial which is presently set for April 3.

**IV. ANALYSIS**

<u>Fed. R. Evid. 801(d)(2)(E)</u>

Out-of-court statements made by coconspirators are non-hearsay and admissible evidence under Fed. R. Evid. 801(d)(2)(E).[8] <u>United States v. Owens</u>, 70 F.3d 1118, 1123 (10th Cir. 1995). "Before admitting evidence under this rule, 'The court must determine that (1)

---

[7] The same phone calls which were charged in Andrews' indictment are also calls charged in the fifth superseding indictment.

[8] Fed. R. Evid. 801(d)(2)(E) provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

-7-

by a preponderance of the evidence,[9] a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy.[10]'" Id. In determining whether Rule 801(d)(2)(E) is met, the court may rely on the coconspirator statements themselves, but the government must produce some "independent evidence" that a conspiracy exists. Here, the government has satisfied its burden by producing evidence of the surveillance, Andrews' plea agreement and statement.

### Conspiracy

First, the court must determine whether a conspiracy exists.

> To prove conspiracy, the government must show: (1) that two or more people agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent. (Citations omitted). "[A] single conspiracy does not exist solely because many individuals deal with a common central player." (Citations omitted). "What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people." (Citations omitted). On the other hand, "[a] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy." (Citations

---

[9] In the present situation, preponderance of evidence is evidence sufficient to persuade the court that a fact is more likely present than not present. Tenth Circuit Pattern Criminal Federal Jury Instruction 1.05.1.

[10] There are more than 100 statements offered by the government in this case. At this time, the court will not discuss each statement in isolation to determine if it was made in furtherance of a conspiracy. However, the court finds that Andrews' plea agreement and the recorded calls do support a finding that the calls were in furtherance of the conspiracy. Andrews stated in his plea agreement that the calls were made for the purpose of completing a drug transaction. Defendants may object to a specific statement during trial if they do not believe it was made in furtherance of a conspiracy.

-8-

> omitted). The government need only prove by direct or circumstantial evidence "that the defendant knew at least the essential objectives of the conspiracy, and the defendant knowingly and voluntarily became part of it." (Citations omitted).

United States v. Small, 423 F.3d 1164, 1182-83 (10th Cir. 2005). Proof of interdependence depends heavily on the specific facts of each case. United States v. Caldwell, 589 F.3d 1323, 1329 (10th Cir. 2009).

In this case, the government has not charged a single conspiracy with all defendants, as was done in the second superceding indictment. Instead, the government charged only two separate conspiracies, one conspiracy involving Biglow and one involving Black involving both known and unknown individuals who are not specifically identified. However, the government does not have to charge a conspiracy with all defendants in order to introduce statements from an alleged coconspirator. United States v. Alfonso, 738 F.2d 369, 371 (10th Cir. 1984).

In its response, the government states that the calls establish defendants' relationship with Andrews and their "mutual desire to distribute an illegal commodity for financial gain." (Doc. 849 at 4). The government then identifies numerous calls it intends to introduce during trial, all which include Andrews and one other defendant or previous co-defendant. The intercepted calls include the following prior co-defendants: Cornell Beard, Timothy Collins, Robert Dear, Ricky Henry, Dornell Johnson, Miguel McPhaul, Jerry Newton, Clifton Parks, Jose Pizana, and Steven Rich. Therefore, in order to admit the calls during trial, the government must prove that all individuals were a part of either or both of the conspiracies separately alleged

-9-

in counts 1 and 2.

This court's prior order discussed two types of drug conspiracies which involve more than two individuals, the "chain-and-link" conspiracy and the "hub-and-spoke" conspiracy. In a "chain-and-link" conspiracy, or a vertical conspiracy, there are a series of consecutive buyer-seller relationships. Caldwell, 589 F.3d at 1329. "A classic vertical conspiracy involves Supplier A selling contraband to Supplier B, who then sells the contraband to Supplier C." Id. In this case, the alleged organization does not fit into a vertical conspiracy. The two individuals at the top of a conspiracy involving Andrews are Valencia-Abarca and Pizana, who supplied Andrews with kilos of cocaine. Andrews, in turn, supplied several individuals, including defendants, with cocaine to presumably distribute on the street. Defendants and their prior co-defendants were not involved in vertical transactions with each other. Instead, they each independently sold the cocaine to third parties. "Thus, their relationship does not evince the characteristics of a vertical conspiracy." Id. (citing United States v. Kiister, No. 99-3042, 2000 WL 228304, at *7 n. 10 (10th Cir. Feb. 29, 2000) (unpublished) (indicating that evidence showing a conspiracy among "equal-level purchasers" may be "less applicable in a vertical conspiracy" context)).

The facts of this case therefore would fit more neatly into the category of a "hub-and-spoke" conspiracy, in which several separate players all interact with a common central actor, here Andrews. Id.; see also Doc. 565. In Caldwell, a case decided after this court's initial decision concerning the statements issued in 2009 (Doc. 565),

the Tenth Circuit dealt with the admissibility of statements of alleged coconspirators in a three person conspiracy. Two of the defendants in Caldwell were supplied drugs by one defendant. The Tenth Circuit characterized the conspiracy as a "hub-and-spoke" conspiracy because two of the defendants were on an equal level and redistributed the drugs on the street. Instead of evaluating the logistics of a "hub-and-spoke" conspiracy, the Circuit turned to question of interdependence reasoning that "because any conspiracy requires a showing of interdependence, we prefer to eschew rigid labels and instead engage in the general, yet fact-specific, inquiry of whether there is evidence of interdependence among all alleged coconspirators." Id.

Therefore, the court will turn to the question of interdependence in this case. "Interdependence exists where coconspirators intend to act together for their shared mutual benefit within the scope of the conspiracy charged." Id. (citing United States v. Evans, 970 F.2d 663, 671 (10th Cir. 1992)). "When multiple individuals are involved in the sale of illegal drugs, they are engaged in an inherently illicit enterprise," but the court must "scrupulously safeguard each defendant individually, as far as possible, from loss of identity in the mass." Id.

As this court previously recognized in its 2009 order and the Tenth Circuit has reaffirmed in Caldwell, the evidence must show a mutual benefit:

> It is not enough that a group of people separately intend to distribute drugs in a single area, nor even that their activities occasionally or sporadically place them in contact with each other. People in the same industry in the same locale (even competitors) can occasionally be expected

> to interact with each other without thereby becoming
> coconspirators. What is needed is proof that they intended
> to act together for their shared mutual benefit within the
> scope of the conspiracy charged.

Caldwell, 589 F.3d at 1330 (quoting United States v. Evans, 970 F.2d 663, 670-71 (10th Cir. 1992)).

Based upon the evidence heard at the James hearings, the court finds that interdependence is virtually non-existent among all defendants and alleged coconspirators. There is no evidence that Andrews told defendants or the coconspirators to go to each other when he was running low or out of cocaine. Nor is there evidence that the coconspirators referred their customers to other coconspirators if they happened to be out of cocaine. In fact, one of the calls support a finding that Black was upset when Andrews was almost out of cocaine and did not want Andrews to supply another individual with his remaining product. See Call #227 ("don't leave me out there. . . . F--k them.") There is no evidence that the coconspirators talked with one another about distributing cocaine.

There is evidence that defendants were aware of the existence and were dependent on Pizana and Valencia-Abarca; however, there is no evidence that the coconspirators relied on each other for their success and mutual benefit in accomplishing the common objective to distribute cocaine for profit in the Wichita area. "[S]haring a common supplier, without more, does not demonstrate that two drug dealers are acting together for their shared mutual benefit." Caldwell, 589 F.3d at 1330 (citing United States v. Edwards, 69 F.3d 419, 431 (10th Cir. 1995)). The government presented no evidence that Andrews "fronted" cocaine to co-defendants and/or received a cut or

-12-

percentage of any money from any of their sales of cocaine to others. See, e.g., United States v. Small, 423 F.3d 1164, 1184 (10th Cir. 2005).

The plea agreement supports a finding that Andrews sold cocaine to all defendants at various times but it does not support the conclusion that defendants had entered into a conspiracy. Accordingly, the court concludes that the government has failed to demonstrate by a preponderance of evidence that defendants were engaged in a conspiracy with the previous co-defendants. Therefore, the first requirement for admission of coconspirator hearsay statements has not been met and the conversations which include Cornell Beard, Timothy Collins, Robert Dear, Ricky Henry, Dornell Johnson, Miguel McPhaul, Jerry Newton, Clifton Parks, and Steven Rich cannot be admitted under Rule 801(d)(2)(E).

Turning to the conversations with defendants and Andrews, however, the court finds that the government has established by a preponderance of the evidence that there were separate conspiracies between Andrews and each defendant; including Reynolds and Reed, who are not specifically charged. The plea agreement and phone conversations support a finding that Andrews and each individual defendant had ongoing illicit relationships. There were several calls between defendants and Andrews which demonstrated their interactions and joint purpose of dealing cocaine. Therefore, the conversations with Andrews and each defendant are admissible under Rule

801(d)(2)(E).[11]

Moreover, the court also finds that the government has established by a preponderance of the evidence that Pizana was a member of the conspiracies. Several calls evidence the knowledge of defendants that Andrews was receiving the cocaine from either "fat boy" and/or the "high boy." See Calls 100 (Biglow); 121 (Black); 125 (Reed). The government has established that separate vertical conspiracies existed between Pizana, Andrews and each defendant. The calls between Pizana and Andrews clearly demonstrate that Pizana was supplying Andrews with kilos of cocaine. See, e.g., calls 35, 118, 170. Andrews was then in turn supplying that cocaine to defendants. There was interdependence in these separate vertical conspiracies as each individual relied on the prior individual in the chain to provide him with the cocaine.

## V. CONCLUSION

Defendants motions to exclude the statements of the alleged coconspirators are granted in part and denied in part. (Docs. 775, 810, 843, 844, 846). The government may introduce statements of the following individuals during trial: James Black, Michael Biglow, Clerance Reed, Gregory Reynolds, Tyrone Andrews and Jose Pizana. It

---

[11] Additionally, as an alternative to the hearsay rule, the government asserts that Andrews' statements made during the calls with defendants can be admitted under the adoptive or admission pursuant to Fed. R. Evid. 801(d)(2)(B). The government asserts that defendants did not contradict Andrews during the calls and the calls exhibited agreements and a familiarity with one another. Although the court has determined that the statements are admissible under the coconspirator exception, the court agrees that Andrews' statements would also be admissible under Rule 801(d)(2)(B). See United States v. Woods, 301 F.3d 556, 561 (7th Cir. 2002); United States v. Miles, 2000 WL 121281 *3 (10th Feb. 1, 2000).

may not introduce calls involving the other originally-charged defendants.

This legal determination creates a practical problem for which the government must propose a solution prior to trial, assuming the case goes forward as charged. Only Biglow and Black are charged in separate conspiracy counts. Under proper instructions, which of necessity must be given when the calls are admitted in evidence and, in all probability at the conclusion of the case, the jury must be told how to consider, or not consider, the calls as to each defendant. At this time, the court cannot figure out how to do this.

Therefore, on or before March 2, 2012, the government must propose a solution in the form of an instruction or instructions which will ensure that the jurors will properly consider the calls. In the alternative, the government may wish to consider severance of Reynolds and/or Reed. Defendants may respond on or before March 12, 2012.

IT IS SO ORDERED.

Dated this   22nd   day of February 2012, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE